**UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF RHODE ISLAND**

| | |
|---|---|
| UNITED STATES OF AMERICA<br>      v.<br><br>AMBULAI R. SHEKU,<br>      Defendant. | CR No. 16-091S |

**UNITED STATES' MEMORANDUM IN AID OF SENTENCING**

From 2009 to his dismissal in 2015, the defendant operated a scheme to defraud at the Rhode Island Department of Labor and Training (DLT) where he was a trusted employee.  The scheme was designed to gain unauthorized access to DLT's computer system, at which time the defendant was able to manipulate the data in that system to obtain undeserved unemployment benefits for over 20 individuals.  Many of these individuals – friends and associates of the defendant – shared the stolen funds with the defendant.  The funds consisted of both State and federal dollars.  All told, investigators have determined that the amount of funds stolen during the execution of the scheme to defraud is approximately $486,336.[1]

---

[1] Although the Information estimated the loss here at approximately $508,691 (Information, ¶ 9(f)), investigators working with the defendant have adjusted that number downward to $486,366.

1

The very magnitude of this crime, combined with the obvious need to deter those similarly situated, calls for serious punishment. However, the defendant did offer to cooperate with law enforcement, to assist investigators in accounting for the funds stolen, and to identify coconspirators. The results of this cooperation are a mixed-bag, and the benefits of his cooperation remain to be seen. However, the limited utility of the defendant's cooperation warrants some leniency; thus, the government recommends a sentence at the low end of the guidelines.

**A. Facts and Plea Agreement.**

As noted in the Offense Conduct section of the PSR in this case, the Rhode Island Department of Labor and Training ("DLT") is the State Workforce Agency in the State of Rhode Island responsible for the implementation and operation of various state and federal workforce programs including the Unemployment Insurance (UI) program. The Department of Labor and Training operates its programs using a combination of federal and state dollars. The Unemployment Insurance Program within the Income Support Division pays Unemployment Insurance Benefits to eligible recipients. The benefit payments are typically funded by tax dollars paid by Rhode Island employers. However, during times of extreme unemployment or in special programs, the

federal government offsets the cost of unemployment benefits for the states.

The Unemployment Insurance Program provides temporary income support ("UI benefits"), in the form of weekly cash benefits for the period of time that the eligible employee seeks new work. The unemployed worker must file an application for benefits with DLT for the UI benefits. This application in Rhode Island was filed either over the internet or via the telephone. The amount of weekly UI benefits paid to a claimant was based on the claimant's prior earnings, as reported by the employer for a specified time period called the "base period." The resulting claim for benefits must be certified for each week in order to receive benefit payments. During the time set forth in the Information (June 2009 to February 2015), certification was made via the internet or telephone using the claimant's social security number, benefit year ending code and personal identification number.

During the time described in this Information, the available payment methods were direct deposit to a financial institution or via electronic payment card (EPC) which functions like a bank debit card. Funds for the benefits were drawn from state-controlled accounts at financial institutions which operated in interstate and foreign commerce. The electronic payment cards were distributed to claimants by U.S. mail.

The computer system that DLT used to administer unemployment insurance benefits is a comprehensive benefits system that allowed for initial claims, continued claims, refiled claims and extensive special programs.  Staff members at DLT such as the defendant were given limited authorized access to DLT's computer system.

From February 2009 to February 13, 2015 Defendant Ambulai R. Sheku was a Senior Employment and Training Interviewer for DLT.  In his role, Sheku was responsible for answering customer calls, processing claims, providing customer service via telephone and email, issuing payments and other related functions as directed by management, all subject to the limitations on his authority set by DLT.  Sheku had general call center level access to DLT's computer system; however, he did not have access to certain areas of the system.  Further, changes in a claimant's profile, including address changes, had to be authorized by the claimant.

It was part of the scheme to defraud in this case that Sheku would, without authorization and exceeding his authorized access to the DLT computer system, change the addresses of legitimate UI beneficiaries, thus causing the banks funding the UI benefits to send by U.S. mail a new EPC card to another member of the conspiracy, who would then be able to fraudulently obtain cash and/or goods by utilizing the EPC card.   Sheku

would also, again exceeding his authorized access to the DLT computer system, take steps to extend the expiration of benefits of others he was conspiring with.

In this way, Sheku also caused fraudulent claims, including claims by individuals who were employed and thus ineligible for UI benefits, to be approved for such benefits. By doing so, he fraudulently increased the balance of UI benefits available to members of the conspiracy. Sheku sometimes achieved these results by fraudulently removing blocks or "stops" on the payment of further benefits that DLT had validly imposed, thus allowing a coconspirator to continue receiving benefits to which he was not entitled.

Thus, from June 2009 to February 2015, Sheku fraudulently obtained UI benefits of approximately $486,366 (for himself and others). Of this total, approximately $351,726 were federal funds.

*Plea Agreement.* On November 22, 2016, the defendant pled guilty to a three-count information, pursuant to a plea agreement. That agreement binds the government to recommend a sentence within the guideline range determined by the Court. The defendant is free to advocate for any sentence he deems reasonable. The parties agreed that there is a loss of greater than $250,000, but less than $550,000, resulting in a guideline enhancement of 12 levels.

**B. Sentencing Factors.**

**1. The Seriousness of the Offense.**

As the Court is well aware, a sentencing court should first consider "the nature and circumstances of the offense"; as well as "the need for the sentence imposed ... to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense."  18 U.S.C. § 3553(a)(1) and (2)(A).

Here, the nature of the offense was a corrupt one.  The defendant worked in a position of trust for the State of Rhode Island, and was also a trusted agent in the disbursement of federal unemployment compensation dollars.  As a public employee (albeit not an elected official), Mr. Sheku should be held to a higher standard than the general public.  He violated the public trust for personal gain.  He took deliberate action to hide his activity, further demonstrating his awareness of the wrongfulness of his acts.  A significant prison sentence, by demonstrating to the public that this abuse of the public trust will not be tolerated in Rhode Island, will help "promote respect for the law."  18 U.S.C. § 3553(a)(2)(A

It should also not be forgotten that, in defrauding the Rhode Island Unemployment Insurance Trust Fund, the defendant's conduct resulted in an undue tax burden on Rhode Island employers.  Rhode Island employers pay a tax on payroll each

6

quarter to finance the unemployment program. The tax on employers is determined by an "experience rating." Similar to auto insurance, the more that is paid out from an employer account, the higher the tax rate goes.

### 2. Deterrence.

A sentencing court in a criminal case should consider the need "to afford adequate deterrence to criminal conduct." 18 U.S.C. § 3553(a)(2)(B). It stands to reason that in this case, a prison sentence is essential to deter other government employees from committing similar frauds by abusing their positions of trust. A significant prison sentence here would also deter recipients of fraudulently obtained benefits – themselves coconspirators in these cases - as well.

### 3. The Defendant's Characteristics.

*Criminal History & Rehabilitation.* The defendant, to his credit, does not have any criminal history. As the Court knows, this is a relatively common phenomenon in white-collar case. Nevertheless, his lack of a criminal record is obviously a factor warranting some leniency, and bodes well for the prospect of rehabilitation. 18 U.S.C. § 3553(a)(2)(D). The defendant here already possesses a bachelor's degree in computer-related fields (PSR ¶¶ 54, 55), so there is little need for education. Indeed, in this case, he used his skills with computers to commit the instant offense.

In his Sentencing Memorandum, the defendant asks to be spared a jail sentence so that he can support the child that a former girlfriend is carrying. The relationship with the mother of this child appears not to one of especially deep commitment, to say the least (with the defendant stating the two are "not currently in a relationship", PSR ¶ 42). Through counsel, the defendant objects to the mother's assertion that the defendant will not take on the responsibilities of a father.

*Cooperation.* As counsel noted in his Memorandum, the defendant met with agents investigating these matters on several occasions. He always made himself available when requested. Being candid with the agents about his own conduct, the defendant appeared to take fully personal responsibility for his own guilt in the scheme. The biggest strength of these sessions, from the government's point of view, was the insight gained from the defendant regarding systemic weaknesses – particularly in the dated computer system utilized by DLT - and how he and others were able to abuse those weaknesses to carry out the scheme to defraud.

One other goal of investigators, however, is the need to hold others who benefitted financially from the scheme accountable. Perhaps because of the defendant's friendships with many of these individuals, the quality of the information he provided in this regard was uneven at best.

**C. Conclusion.**

For all of the above reasons, the United States believes that this case might ordinarily be sentenced at the high end of the guidelines. However, given the defendant's efforts to cooperate – which he was under no obligation to do – the government respectfully recommends that the defendant be sentenced to 21 months in prison, placed on 3 years supervised release, and be ordered to make restitution totaling $486,336.[2]

                                              Respectfully submitted,

                                              UNITED STATES OF AMERICA

                                              By its Attorneys,

                                              STEPHEN G. DAMBRUCH
                                              Acting United States Attorney

                                              /s/ Terrence P. Donnelly
                                              TERRENCE P. DONNELLY
                                              Assistant U.S. Attorney
                                              50 Kennedy Plaza, 8th Floor
                                              Providence, RI 02903
                                              (401) 709-5000 - Phone
                                              Terrence.Donnelly@usdoj.gov

---

[2] The defendant attached to his sentencing memorandum a statistical analysis by MCM Data Consulting. Needless to say, the study confirms the unsurprising notion that the overwhelming majority (81%) of defendants who have the same basic guideline factors as the defendant are sentenced to prison. It also confirms the basic observation that every case, and every defendant, is unique. As this Court knows, "the devil is in the details." The study, of course, does not give this Court any facts of the underlying cases by which a truer comparison could be made (e.g., abuse of trust). The guidelines have it right here.

CERTIFICATE OF SERVICE

      I hereby certify that on this 30th day of March, 2017, a copy of the within Government's Consolidated Memorandum in Aid of Sentencing was filed electronically and is available for viewing and downloading from the ECF system.

    Electronic notification:

    John R. Grasso, Esquire
    jrg@johngrassolaw.com

                                  /s/ Terrence P. Donnelly
                                  TERRENCE P. DONNELLY